UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Civil No. 17-1915(SRC)

- - - - - - - - - - - - - - - -X
                                :
JAMES CLARKE, for himself and   :
all others similarly situated,  :  October 2, 2019
                                :
            Plaintiff,          :
                                :
            -vs-                 :
                                :
FLIK INTERNATIONAL CORP. And    :
COMPASS GROUP USA, INC.,        :
                                :
            Defendants.         :
- - - - - - - - - - - - - - - -X


Frank R. Lautenberg Post Office & Courthouse
Newark, New Jersey 07102


B E F O R E:

            THE HONORABLE STANLEY R. CHESLER,
       SENIOR UNITED STATES DISTRICT JUDGE


PHYLLIS T. LEWIS, Official Court Reporter
ptlcsr@aol.com
732-735-4522

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription


PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

A P P E A R A N C E S:

STEPHAN ZOURAS, LLP
604 Spruce Street
Philadelphia, Pa. 19106
215-873-4836
BY:  DAVID J. COHEN, ESQ.
Attorneys for the Plaintiff.


FISHER & PHILLIPS, LLP
620 Eighth Avenue
New York, New York 10018
212-899-9960
BY:  BRIAN J. GERSHENGORN, ESQ.
        SETH D. KAUFMAN, ESQ.
Attorneys for the Defendants.

I N D E X

WITNESS                    DIRECT   CROSS   REDIRECT

JAMES CLARKE

    By Mr. Cohen            6              49

    By Mr. Kaufman                 23

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | ID | EVIDENCE |
|---|---|---|---|
| 1 | Declaration | | 7 |
| 2 | Supplemental Declaration | | 7 |
| 3 | Transcript Pages 1-45 | | 10 |
| 4 | Transcript Pages 74, 79, 80 | | 10 |
| 5 | Opt-in Consent Forms | 14 | |

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

THE CLERK:  All rise.

THE COURT:  Be seated.

THE CLERK:  This is James Clarke versus Flik International Corp, 17-1915.  Please note your appearances for the record.

MR. COHEN:  Good afternoon, your Honor.

My name is David Cohen from law firm of Stephan Zouras.  I am here representing the named plaintiff in this case, and with me is Mr. Clarke.

THE COURT:  Very good.

MR. COHEN:  Thank you, your Honor.

MR. KAUFMAN:  Seth Kaufman, and my colleague, Brian Gershangorn, from the law firm of Fisher Phillips, and we represent the defendants.

THE COURT:  Very good.

All right.  So we are here coming back on having Mr. Clarke tell us exactly what happened and how we ended up having these various statements made about his knowledge of the fellow employees.

So, Mr. Clarke, retake the stand.

All right.  We will let your attorney, Mr. Cohen, proceed with the examination.

Go ahead.

MR. COHEN:  Thank you, your Honor.

Mr. Clarke, if you don't mind.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

(Clerk and Court confer)

THE COURT:  Thank you Ms. Trivino.

I have suggested that you advise Mr. Clarke that, indeed, it might be wise for him to obtain a somewhat independent attorney.

What is the status of that?

MR. COHEN:  Yes, your Honor.

I did, in fact, advise Mr. Clarke exactly as you suggested I should.  His attorney, Mr. Jeffrey Stern, who represented him in the workers' comp matter is scheduled for multiple workers' compensation court appearances today.  He advises me that he is available by phone, if your Honor would like to speak with him.  I have his number that's available.

THE COURT:  I don't want to speak to him.  I just want to make sure that Mr. Clarke understands that, indeed, the nature of these proceedings is such that he may indeed need to consult with independent counsel.

MR. COHEN:  Yes, your Honor.

He has done so.  Unfortunately Mr. Stern is not available to be here today.

THE COURT:  Okay.  Well, we are going to proceed. Let's go.

MR. COHEN:  Yes, Judge.

THE CLERK:  Wait.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

Please place your left hand on the Bible and raise your right.

Do you solemnly swear the testimony you're about to give in the case before the Court is the truth, the whole truth, and nothing but the truth so help you God?

MR. CLARKE:  Yes, I do.

J A M E S   C L A R K E, having been duly sworn, testified as follows:

THE CLERK:  Please state your full name for the record.

THE WITNESS:  James Clarke.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. COHEN:

Q.  Good afternoon, Mr. Clarke.

A.  Good afternoon.

Q.  Thank you for coming in today.

A.  You are welcome.

Q.  Mr. Clarke, did you offer two sworn statements supporting a motion for conditional certification in this case, one in May of 2018 and one in July of 2018?

A.  That is correct.

MR. COHEN:  Your Honor, I have copies of Mr. Clarke's statements.  May I mark them as exhibits?

THE COURT:  You may.

MR. COHEN:  Exhibit 1, your Honor, will be the declaration of James Clarke, Docket No. 35-4 in this case filed May 2nd, 2018.

Exhibit 2 will be the supplemental declaration of James Clarke, Document 39-2 filed in this case on July 10th, 2018.

(James Clarke's declaration marked Exhibit 1)

(James Clarke's supplemental declaration marked Exhibit 2)

THE COURT:  Okay.

MR. COHEN:  May I present them to the witness?

THE COURT:  You may.

MR. COHEN:  I advised defense counsel about using these exhibits and they --

THE COURT:  I am sure they have copies, multiple copies.

Q.  Mr. Clarke, do these statements say that during your work for Flik in Whippany, New Jersey, you personally saw many other Flik associates working off the clock?

A.  Yes.

Q.  Do these declarations say that you personally saw many other Flik associates doing off the clock preshift work?

A.  Yes.

Q.  Do these declarations say that you personally saw many other Flik associates doing meal break work off the clock?

A.  Yes.

Q.  Do these declarations say that you personally saw many other Flik associates working off the clock after their shift?

A.  Yes.

Q.  Mr. Clarke, have you, in fact, personally seen many other Flik associates work off the clock in Whippany, New Jersey?

A.  Yes.

Q.  When was the first time that you recall seeing a Flik associate work off the clock?

A.  The first time that I believe I recall seeing for the first time associates working off the clock was during the christening of the building in the summertime of 2013.

Q.  So in the summer of 2013, there was a celebration for the office building opening up, is that right?

A.  Yes.

Q.  And that is the day you are saying that you believe you saw Flik associates working off the clock?

A.  Yes, I believe they was working off the clock.

Q.  What did you see?

What did you see them doing?

Why did you think they were working off the clock?

A.  Because when I came to work, I seen that it wasn't time for individuals to clock in, and individuals was setting up

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

stations, getting a few items out of the refrigerator, setting up garbage cans.

And they actually told me that they didn't -- they actually told me that they was -- that they was not clocked in.

Q.   When was the next time that you remember seeing Flik associates working off the clock at Whippany?

A.   The next time I really noticed when an associate was working off the clock was in 2015.

Q.   What did you see?

A.   I seen associates coming in early, begin setting up their stations, getting a few items out of the refrigerator, garbage cans, and they hadn't clocked in already.

Q.   How did you know they didn't clock in?

A.   Because they were complaining to me how they got to come in early and do work without getting paid.

Q.   The off-the-clock work you noticed in 2015, how long did that continue?

A.   I have seen that quite frequently.  That went all the way into 2016.

Q.   So for those two years or -- I'm sorry -- when in 2015 do you believe you first started seeing people working off the clock?

A.   I believe it was in around August of 2015.

Q.   And did you continuously see people working off the

clock in Whippany after that?

Was it a regular occurrence that you saw?

A.  Yes, I seen it a lot.  I seen multiple people working off the clock.  That is when I really started taking notice of it.

Q.  Mr. Clarke, did you offer sworn testimony about your work for Flik in a workers' compensation proceeding in April of this year?

A.  Yes, that is correct.

MR. COHEN:  Your Honor, I have two exhibits I would like to introduce.  I discussed them with defense counsel.

May I bring them up?

THE COURT:  Sure.

MR. COHEN:  Your Honor, Exhibit 3 is the April 10th, 2019 workers' compensation transcript -- I'm sorry -- hearing transcript before the Honorable Christopher Leitner, L-e-i-t-n-e-r, and this is Exhibit 3, which consists of Pages 1 through 45 of that transcript,

Exhibit 4, your Honor, is a transcript -- the same transcript Pages 74, 79 and 80.

THE COURT:  All right.

Put them into evidence.

(Transcript pages 1-45 marked Exhibit 3)

(Transcript Pages 74, 79 and 80 marked Exhibit 4)

MR. COHEN:  Your Honor, Exhibits 3 and 4 are from a

filing attached to defendants' sanctions motion, but I apologize, I don't know the docket number.  Perhaps defense counsel can help with that, if they know.

MR. KAUFMAN:   Docket 62 is the filing.

MR. COHEN:  Thank you very much.

THE COURT:  All right.

Q.  Mr. Clarke, in this hearing, did you testify that during your work for Flik in Whippany, New Jersey, some Flik associates complained to you about working off the clock?

A.  Yes, that is correct.

Q.  That testimony was in response to a question posed by the Judge on Page 41 of Exhibit 3.

MR. KAUFMAN:  Your Honor, I would like to object on the grounds of leading the witness.

THE COURT:  Sustained.

MR. COHEN:  I was just directing him --

THE COURT:  You can direct him to particular portions of the transcript, but that's all.

MR. COHEN:  I just wanted to direct him to the page, your Honor.  That is all.

Q.  Could you please open up Exhibit 3 to Page 41?

A.  Okay.

Q.  Do you see the Judge's question beginning on Line 19:

Did your employer require other employees to work similar overtime without pay or was it just you?

A.   Yes.

Q.   And in response on Page 40, you offered testimony on Page 42, Lines 5 to 7?

THE COURT:  Counsel, if you are going to read testimony, have him read the testimony and read sequentially, all right?

There are some other responses, are there not?  That question you already asked --

MR. COHEN:  Yes.  It was a question, your Honor.

THE COURT:  Why don't we get that answer on the record.

MR. COHEN:  Of course.  I will read the testimony.

The Judge's question:  Did your employer require other employees to work similar overtime without pay, or was it just you?

The Witness:  I can't -- I don't know if they did.

The Court:  Okay.  Fair enough.

By Mr. Stern:  Okay.  Did you --

The Witness, Mr. Clarke:  I am sorry.  I recall something.

Mr. Stern:  Okay.

The witness:  Yeah.  I do recall some of the -- some of my associates complaining to me that they was being forced to work off the clock free.

Q.   Mr. Clarke, have some Flik associates, in fact,

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

complained to you about working off the clock in Whippany, New Jersey?

A.   Yes.

Q.   When was the first time that you remember hearing a complaint like that?

A.   The first time was in the summertime of 2013.

Q.   Who complained to you?

A.   I can't remember all of the names, but Miguel and Stephen Teller.

Q.   Are Miguel and Stephen the only Flik associates who complained to you about working off the clock at Whippany in 2013?

A.   There were others, but I don't recall their names.

Q.   In 2013 and 2014, how many Flik associates do you remember complaining to you about having to work off the clock?

A.   Between 2013 and 2014?

        That was -- I recall that incident in -- as far as the christening, but after that I didn't really pay it too much mind.

Q.   So is it your testimony that the people at the christening event in the summer of 2013, Miguel and Stephen, and possibly some other people complained to you in this time frame, or are there other people you can remember?

        THE COURT:  Please don't lead.  That is just

leading, all right.

Ask the witness questions, which are open-ended. We got his response so far.  Don't try to double up.

Q.  Are there other people you can remember?

A.  No.

(Opt-In Consent Forms marked Exhibit 5 for identification)

MR. COHEN:  Your Honor, I would like to introduce what I have marked as Exhibit 5, which are copies of the opt-in consent forms filed in this case as Document 47-1, Document 50-1, Document 53-1, and Document 49-1.

May I approach, your Honor?

THE COURT:  What is the relevance of those?

MR. COHEN:  I'm sorry?

THE COURT:  What is the relevance of the opt-in forms?

MR. COHEN:  These are individuals, your Honor, who opted into the case to pursue the claim that Mr. Clarke has described.  So to the extent that he has had discussions with them or observed them, it would support his position in the litigation, and it would help to explain the difference between --

THE COURT:  How is it going to do that?  He didn't offer these.

We have asked him what his memory is of a certain

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

period of time.  You have gotten his testimony about that period of time.

His certification was based upon his knowledge. The questions, which were asked at the hearing, were based on his knowledge, okay?

MR. COHEN:  I will move on, Judge.

THE COURT:  Please.

Q.  Mr. Clarke, during the workers' compensation hearing in April of 2019, when the Judge asked you the question I read, if Flik required other associates to work without pay, why did you only give him information about some complaints you heard in 2013 or '14 instead of telling him everything --

MR. KAUFMAN:  Objection.

THE COURT:  Objection sustained.

As I understand the witness' testimony, and we will get back, all right?  My understanding of the testimony is he observed or had conversations with employees at the christening event in 2013.

His testimony is that subsequent to that, for 2013 and 2014, I don't believe he said that he's' got any recollection of any further conversations.

Now is my recollection incorrect?

MR. COHEN:  Your Honor, I believe his testimony about the conversations with employees, Miguel and Stephen, were in that same time period, and he said there were other

individuals whose names that he didn't recall.

I believe he was answering questions about that time period.

MR. KAUFMAN:  My recollection, your Honor, is not the same as Mr. Cohen's.

My recollection is that he testified that these conversations occurred at the christening in 2013 and then not again until August of 2015.

THE COURT:  Let's just go back for a second, all right?

MR. COHEN:  Your Honor, I can --

THE COURT:  No.  I want to find the testimony.

Look, I will read the testimony so far at the beginning:

So in the summer of 2013, there was a celebration for the office building opening up, is that right?

Yes.

And that is the day you are saying that you believe you saw Flik associates working off the clock?

Answer:  Yes, I believe they was working off the clock.

Question:  What did you see?

What did you see them doing?

Why did you think they were working off the clock?

Answer:  Because when I came to work, I seen that

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

it wasn't time for individuals to clock in, and individuals was setting up stations, getting a few items out of the refrigerator, setting up garbage cans.

And they actually told me that they didn't -- they actually told me that they was -- that they was not clocked in.

When was the next time you remember seeing Flick associates working off the clock?

The next time I really noticed when an associate was working off the clock was in 2015.

What did you see?

Answer:  I seen associates coming in early, begin setting up their stations, getting a few items out of the refrigerator, garbage cans, and they hadn't clocked in already.

How did you know they didn't clock in?

Okay.  I don't understand the witness' testimony.  It was between this christening of the building in 2015, he didn't notice anything.

MR. COHEN:  May I ask a question to clarify that, Judge?

THE COURT:  Well, yes, but you know frankly, that was rather a clear answer, which was between 2013 and 2015, he didn't see anybody clocking in, working off of the clock.

MR. COHEN:  Yes, your Honor.

The other line of questioning I posed to the witness wasn't about what he had seen, but instead what he had heard, so his testimony --

THE COURT: Fine. So let him testify as to what he heard without you telling him what you think he may say.

MR. COHEN: I apologize, your Honor, of course.

Q. Mr. Clarke, when do you remember hearing from Miguel and Stephen that they had worked off the clock?

A. That was around the christening of the building.

Q. When do you remember hearing from other Flik employees, whose names you can't remember right now, that they were working off the clock, what years?

A. The year in 2013, I heard a few associates was telling me that, but I didn't pay too much mind to it.

Then I started really noticing and started hearing a lot about it in 2015.

Q. Mr. Clarke, did you know anything about hearing or seeing off-the-clock work at the Whippany location that you didn't tell the Judge in response to the question he asked you?

MR. KAUFMAN: Objection.

THE COURT: First of all, which Judge?

MR. COHEN: At the hearing, your Honor, I said in response to the question he asked.

THE COURT: Let me see that question again.

Go ahead.  Answer the question.

THE WITNESS:  Can you repeat it, please?

MR. COHEN:  Yes.

Q.  At the hearing, the workers' compensation hearing, did you know any information about off-the-clock work at Flik that you didn't describe to the Judge in your answer to his question?

A.  At the workers' comp hearing, I didn't recall that information at that time because I was nervous and I was told that the hearing was about my wage -- I mean, about my workers' comp issues, and I didn't -- I didn't think it was important to go into like great detail as far as my wage and hour issues.

Q.  What information are you saying that you didn't mention to the Judge in the workers' comp hearing?

A.  I didn't mention how I -- I mean, I known the individuals that was working off the clock at the christening of the building.

Q.  Did you make any effort during the workers' compensation hearing to offer more information about the off-the-clock work that you knew about at the Whippany location?

A.  Yes.

Q.  Can you describe what you mean, please?

A.  Like towards the end of my workers' comp hearing, what I was asked was that everything that happened in those years,

and I said that there was so -- a lot more that happened in those three years, but nobody asked me anything about it, so I didn't offer any more information.

Q.   Could you look please at Exhibit 4, Page 74?

Do you see the question there at the top of the page from your lawyer, Mr. Stern?

Can you think of something we haven't talked about?

Your answer:  At this point, no.

Then by Mr. Stern:  Okay.  I just want to make sure.  I don't want to miss anything.  I want to discuss the conduct of the people at that place that you worked.

Then your answer there on Page 74, could you read that, please?

A.   I am sorry.  I am lost.

Q.   Beginning with the word "Yeah."

A.   That was on Page 74?

Q.   Yes.

A.   Oh.

Yeah.  I do recall when I complained to Robert Falcon, even Chef Patel, Chef Ryan, Chef Holman, Chef Jonathan, I am still being forced to work off the clock, and it is not right.

Other people is being forced to work off the clock. They are telling me -- they are telling me -- they are telling and other people -- other people were -- me and

other people were working -- were being forced to work off the clock, and it is not right.

And one of the managers, his name is Chris Kemp, asked people work off the clock.  And on a particular day approximately October of 2016, he told me to get to work. He wanted me to.  He wanted me to.  He wanted me to work off the clock like he had other people working off the clock, and I told him that it is not my time to punch in.

Thank you.

Q.  Mr. Clarke, did you make any other effort during the workers' compensation hearing to bring to the attention of your attorney or the Judge that you knew information about your work at Flik that you hadn't yet talked about?

A.  Yes.

Q.  Can you describe what you mean, please?

A.  Towards the -- I am sorry.  Can you repeat the question again?

Q.   It may be easier just to direct you, sir, to Page 79 of Exhibit 4.  It is the second page.

At the bottom of the page, there is a question from your attorney, Mr. Stern.

We covered a lot here, Judge, and I am pretty confident that we have not covered everything, but I feel like we covered most, if not everything.

Isn't that right, James, most of the stuff that you

went through?

Mr. Clarke's response:  There was so much more. There is a lot more that happened within those three years.

What three years were you referring to there, Mr. Clarke?

A.  I was referring to 2013, 2014, 2015, 2016.

Q.  In response to you making these statements, did your lawyer ask you any more questions about wage and hour issues during this hearing?

A.  No.

Q.  In response to you making these statements, did the workers' compensation judge ask you any other questions about wage and hour issues?

A.  Not that I recall.

Q.  Mr. Clarke, you understand that the point of this hearing today is to help Judge Chesler decide whether to issue sanctions against you based on the issues we are discussing.  Is that right?

A.  Yes.

Q.  Is there anything that you want to say to Judge Chesler about any of these issues?

A.  Yes.

Q.  Please do.

THE WITNESS:  Your Honor, I truly, your Honor, apologize.  I acknowledge that my testimony in the workers'

comp may be seen as contradictory to my sworn statements in my wage and hour case, but that wasn't my intention at all to do anything like that, and I -- I take responsibility and I apologize for any confusion that I may have caused.  But I didn't think at the time when I was in my wage and hour case to go into like great details of my wage and hour.  But when I tried to go into details, they asked me no questions, but I did try.

So I'd just like to apologize to the Court and even also to the Flik's attorneys.  I didn't mean to cause this confusion, your Honor.

THE COURT:  Okay.

Your witness.

MR. KAUFMAN:  Your Honor, can we just take a couple minutes, five minutes tops just to gather our thoughts?

THE COURT:  Sure.

MR. KAUFMAN:  Thank you, your Honor.

(Pause)

CROSS EXAMINATION

BY MR. KAUFMAN:

Q.  Mr. Clarke?

A.  Yes.

Q.  You are aware --

THE COURT:  Counsel, please address the witness from the standing position, okay?

MR. KAUFMAN:  Yes.

THE COURT:  That is always the custom in this court.  You can use the podium or stand at counsel table.

MR. KAUFMAN:  Yes.

Q.  Mr. Clarke, you are aware that this hearing is as a result of a motion filed by defendants to sanction you based on your workers' compensation testimony and declarations that you submitted in this case so far.  Is that correct?

A.  Yes.

Q.  And you are aware that in response to that motion, your attorney filed an opposition brief on your behalf opposing sanctions.  Are you aware of that?

A.  Yes.

Q.  And you are aware that attached to that brief was a declaration supporting that opposition, is that correct?  Are you aware of that?

A.  Yes.

Q.  Okay.  And this would be Docket 64 and 64-1.

And are you aware that -- or do you understand that the purpose of this declaration Docket Number 64.1 -- 64-1 was to provide testimony to support the opposition brief, do you understand that?

A.  Yes.

Q.  Did you review the declaration before you signed it and allowed your attorney to submit it to the Court?

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

A.  Yes.

Q.  Was everything that you stated in there true and accurate in that declaration, 64-1?

A.  Yes.

Q.  And I take it you reviewed the opposition brief that your attorney, Mr. Cohen, submitted on your behalf, Docket 64, prior to Mr. Cohen's statement to the Court?

A.  Yes.

Q.  Everything in that brief factually was accurate, is that correct?

A.  Yes.

Q.  And if something was inaccurate, you would have told Mr. Cohen to change it, is that correct?

A.  Yes.

Q.  I believe your testimony as read by the Judge was that your first notice or you were first told about other employees at the Whippany location working off the clock in 2013 at the christening of the building, and then again in August 2015 was the next time that you were told or claimed to have observed other employees working off the clock.  Is that correct?  Did I fairly summarize that?

A.  You were kind of fast.  Can you please repeat that?

Q.  So the testimony as read back by the Judge was that you first understood or complained that somebody was working -- another employee was working off the clock at the

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

christening of the Whippany facility in 2013?

A.   Yes.

MR. COHEN:   Judge, objection.   The testimony speaks for itself.

MR. KAUFMAN:   Okay.

Q.   So for 2014, and up until August 2015, you were not told by any other employees that they were working off the clock. Is that correct?

A.   I don't recall.

Q.   Okay.

So it would be fair to say that throughout your employment, there would be periods where you did not observe employees working off the clock or were not told other employees were working off the clock?

A.   I may have seen, but I didn't really pay that much attention.   I was more doing what I had to do.   I didn't think it was an issue.

Q.   Are you now changing your testimony?

As I recall the testimony, it was that from 2013 to August 2015, you did not observe or were not complained to by any other employees that they were working off the clock.

Are you now changing your testimony?

A.   Well, what I am saying is that I really started noticing -- really started noticing people working off the clock in August of 2015.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

Q. So before that you didn't notice?

A. I may have seen it, but the most that I really know between 2013, 2014 was the people that told me they was working off the clock, they was complaining they were being forced to work off the clock for free.

Q. This was in 2013 and again in 2015, or are you changing your testimony?

A. No. This was in 2013.

Q. So there were periods of your employment where you did not see employees working off the clock?

A. I can't say I didn't see. I don't recall, but I would hear that, you know, people was working off the clock.

Q. Mr. Clarke, maybe I can take a step back.

You say you observed employees working off the clock in 2013 at the christening, and then not again until August 2015.

So during that period, you did not see other employees working off the clock, and during this time period, would it be fair to say, correct, that you did not see other employees working off the clock?

A. I can't say that I hadn't or had. I just didn't pay no mind. I would just do what I needed to do as far as my work.

Q. Mr. Clarke, do you still have Exhibit 1 in front of you? It would be Docket 35-4.

A.  Okay.

Q.  Do you have that in front of you?

A.  Yes.

Q.  Would you turn to Page 1?

Do you see at the top, where it says:  I, James Clarke, an adult citizen of the State of New Jersey, hereby state under penalty of perjury pursuant to 28 USC Section 1746, that the following facts are true and correct to the best of my knowledge, information and belief, do you see that?

A.  Hum.

Q.  It is right under the heading, Declaration of James Clarke.

A.  Yes.

Q.  Okay.  And if you could turn to the last page, Page 7, is that your signature at the bottom of Page 7?

A.  Yes.

Q.  Did you understand that signature to mean that you were declaring under penalty of perjury that everything contained in this declaration was true?

A.  Yes.

Q.  Okay.

If you would turn to Page 3, Paragraph 10, do you see where it says:  During the three years I worked for Compass/Flik, I personally observed dozens of class members

arrive between 15 and 16 -- 60 minutes early every day to complete off-the-clock work.

Do you see where it says that?

A. Yes.

Q. And you by signing this declaration affirm that this is a true statement?

A. Yes.

Q. So during the entire three years, is that a correct way to -- well, let me strike that.

Are there any qualifiers in this statement that from 2013, the christening, until August 2015, you did not observe or were not complained to by your co-workers that they were working off the clock?

MR. COHEN: Objection.

THE COURT: Overruled.

A. Please, can you repeat that question?

Q. In Paragraph 19, does it say that from 2013, the christening of the Whippany building, until August 2015 you did not observe class members arrive early to work off the clock, and that you did not hear from other employees that they were working off the clock?

MR. COHEN: Objection.

Q. Is that stated in Paragraph 10?

A. You're still on the same page?

Q. Yes, same page, same paragraph.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

A.   Page 3?

Q.   Page 3, Paragraph 10.

In Paragraph 10, is there anything that says from 2013 at the christening of the Whippany building until August 2015, you did not observe co-workers working off the clock and did not hear complaints from co-workers that they were working off the clock?

MR. COHEN:  Objection.

A.   No.  It does not say.

Q.   Does it say in that Paragraph 10 about the gap between 2013 at the christening of the Whippany building until you observed again in August of 2015 employees working off the clock?

Is there any mention of that gap in Paragraph 10?

A.   No, I don't see it.

Q.   Okay.  It is not in there.

Mr. Clarke, do you know why you were asked to submit a declaration that contains these statements in this Document 35-4?

A.   I believe my attorney explained it to me, but I can't recall what he said.

Q.   Okay.  Do you understand that it was in support of a motion for conditional certification of a class of employees?

A.   Yes.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

Q.  And I take it before you allowed your attorney to submit this in support of conditional certification, you reviewed this document, is that correct?

A.  Yes.

Q.  And if there were any changes, you would have asked Mr. Cohen to make those changes?

A.  Yes, that is correct.

Q.  Turning to Page 4, Paragraph 13, do you see where it says:  During the three years I worked for Compass/Flik, I personally observed dozens of class members clock out for their meal break and then before unpaid off-the-clock work, do see where it says that?

A.  Yes.

Q.  Is this a true and accurate statement?

A.  Yes, that is correct.

Q.  Anywhere in Paragraph 13, do you mention that from the christening of the Whippany building in 2013 until August 2015, that you did not observe employees working off the clock and that no employees complained to you about working off the clock?

Is that mentioned anywhere in Paragraph 13?

A.  No, I don't see it.  It's not mentioned.

Q.  Now, turn to Paragraph 16.  I will direct you again:  During the three years I worked for Compass/Flik, I witnessed dozens of class member clock out for the day and

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

then perform unpaid off-the-clock work.

Do you see where it says that?

A. I'm sorry. What number again?

Q. Paragraph 16.

A. Yes.

Q. Anywhere in Paragraph 16, does it say that from the christening of the Whippany building in 2013 until August 2015, you did not observe employees working off the clock and no employees complained to you about working off the clock?

Is that anywhere in Paragraph 16?

A. No.

Q. Mr. Clarke, you testified that -- strike it.

(Counsel confer)

Mr. Clarke, you testified that during your workers' compensation hearing, you were nervous. Is that what you said about giving testimony?

A. Yes.

Q. And you said there was this nervousness that caused you not to mention certain things about your experiences at work, is that correct?

A. Amongst other things, yes.

Q. Okay. And I believe you also said as part of this nervousness, you didn't realize you had to answer questions about your wage and hour case, this case, is that correct?

A.   I don't understand the question.

Q.   I believe your testimony was that you said you were nervous and that you did not understand that you had to answer questions about this case during the workers' compensation testimony.  Is that correct?

A.   No.

Q.   It's not correct?

A.   No.  I believe I said that being that it was a workers' comp issues, I didn't think it was important to go into like great details of my wage and hour issues.

Q.   So are you saying your wage and hour issues were not part of your workers' compensation case?

A.   It was to my understanding that I was going to be speaking about -- in like my PTSD, that is my understanding. I was going to be speaking about my post traumatic stress disorder and more medical things.  That was my understanding.

Q.   Mr. Clarke, without telling me anything that you discussed with your workers' compensation attorney, did you prepare with your workers' compensation attorney for your testimony?

Did you meet with him?

Did you discuss the testimony?

I don't want to entertain any privileged conversations, but did you meet with him?

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

A. Yes.

Q. And did you prepare for your testimony?

A. Yes.

Q. So I assume you were aware of what your attorney was going to be asking you about in the direct examination of your workers' compensation testimony, is that correct?

A. Yes.

Q. So on April 10th, 2019, when you testified in your workers' compensation hearing, who was asking you questions?

A. At first my attorney, and also the Judge asked me some questions.

Q. So none of testimony at issue here from the workers' compensation case involved questions by the opposing party's counsel. It was all your attorney or the Judge?

A. The first hearing was just my attorney and the Judge.

Then the second hearing, the other -- the company's lawyer would ask me questions.

MR. KAUFMAN: Do Exhibits 3 and 4 contain Pages 26 and 27?

I have a full copy of the transcript, if you'd rather.

MR. COHEN: It does. Exhibit 3.

MR. KAUFMAN: It does.

Q. If you would turn to Page 27 of Exhibit 3, the workers' compensation testimony -- actually turn to Page 26.

Do you see on Page 26 there is a question:  Can you give me an estimate, an average or range of how often occasioned that once a week -- once a week, two hours, once a month, five hours, what are we talking about?

You answered maybe once a week.

Do you see that?

A.  Yes.

Q.  Now, that is your attorney, Mr. Stern, asking you questions, correct?

A.  Yes.

Q.  And he is asking you about your hours worked at Compass/Flik, correct?

A.  Yes.

Q.  Now, let's turn to Page 27.

See on Line 3, it says Murphy, who is opposing counsel representing the company:  Your Honor, objection as to relevance.  The petitioner is alleging hostile work environment.  It's unclear what he is asking about in time. The schedule has to do with the live complaint.

The Court:  Counsel, where are you going?

Mr. Stern -- that is your attorney, correct, Mr. Stern?

A.  Yes.

Q.  It has everything to do with it, and I think we discussed it before, how there was an allegation that had

been adjudicated by another tribunal being that he being was forced to work, improper violation occurring with respect to the hours he was working and hours he was being compensated for.

Were you being directed by supervisors there not to clock in, but to begin work and to work without having to clock out and continue to work through lunch breaks, et cetera?

THE REPORTER:  I'm sorry.  Can you slow down?

MR. KAUFMAN:  Oh, I'm sorry.

Q.  These are all things that are the subject of other litigation, but are relevant to the issue of hostile work environment.

That is your attorney, correct?

A.  Yes.

Q.  Saying that the issues regarding you working off the clock are relevant to the issues in the workers' compensation case, correct?

A.  Yes, that is correct.

Q.  Okay.

If you then turn to Page 28, Line 12, do you see Mr. Stern -- actually let's start with Line 10.

The Court:  But is that matter in another tribunal pending or has it been resolved?

Line 12, Mr. Stern:  It has been certified, and it

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

is pending.  So the answer is, it is not totally resolved yet, but it has been certified as a valid claim by that Court.

At that point in time, was it your understanding that the Court had certified your off-the-clock claim as a valid claim?

A.  Yes.

Q.  In what way?

A.  Based on my sworn statements in the declarations.

Q.  Was it your understanding that the Court had made a ruling as to the substance of whether you were owed any overtime?

A.  I don't understand.

Q.  Well, when you say -- when your attorney stated that this case had been certified as a valid claim, I am trying to understand what your understanding of "valid" is.

Is it your understanding that the Court stated that you were owed money?

A.  I don't know about that part.  I don't get it.  I am sorry.

Q.  Well, your attorney represented that this case had been certified as a valid claim by Judge Chesler, and he was told presumably by you, and I don't want to get into privileged conversations, that this claim, this case had been certified as valid.

What do you understand "valid" to mean?

MR. COHEN:   Objection.

THE COURT:   That objection is overruled.

What did you understand "valid" to mean?

A.   Oh, valid as far as what my attorney stated?

Q.   Yes.   Your attorney stated and he's speaking on your behalf as your attorney, he stated this case was certified as valid.

THE COURT:   Actually I take that back.   The objection is overruled.   The truth of the matter is he is not required to read into somebody's mind as to why his attorney was representing --

MR. KAUFMAN:   Fair enough.

THE COURT:   -- I think it may be fair to say that some of these special masters in referencing the compensation law may not have the slightest idea of what a conditional certification of an opt-in class or an FLSA case is.

MR. KAUFMAN:   Understood, your Honor.   I'll move on.

Q.   So going back to Document 64-1, which was your declaration submitted in support of your opposition to defendants' motion for sanctions, I assume that you included in your opposition and in your declaration every argument as to why you should not be sanctioned.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

Would that be correct?

MR. COHEN:  Objection.

Q.  Is that correct, Mr. Clarke?

THE COURT:  I'm sorry.

THE WITNESS:  Am I supposed to answer the question?

THE COURT:  Yes.

A.  Yes.

Q.  So he included every argument that the Judge should not sanction you.

Anywhere in your opposition or your declaration do you state that you were nervous during the workers' compensation testimony, did you say that?

A.  No.

Q.  Okay.

So when you submitted every argument to the Court as to why you should not be sanctioned, you did not include the idea that you were nervous during your workers' compensation testimony, is that correct?

A.  That is correct.

Q.  And nowhere in your declaration or your opposition did you state that you still had testimony to give to the workers' compensation judge, but were not asked the question.  Is that correct?

A.  I believe so.

Q.  Okay.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

As I understand it, you stated that you were only answering that you did not have knowledge of whether your co-workers worked off the clock prior to August 2014, is that correct?

A.  I am sorry.  Can you please say that again?

Q.  Well, I am trying to understand your declaration that you submitted in opposition to the motion for sanctions.

And as I read it, you stated about the question the workers' compensation judge asked you:  I understood this question only to seek the information I knew about off-the-clock work done in New Jersey before August 2014, because all of the other questions I was asked during that part of the hearing were focused on that time period.

Is that what you stated?

A.  Yes.

Q.  So you stated before August 2014, in your workers' compensation testimony, you stated -- I'm sorry.  Strike that.

In your declaration, you stated about your workers' compensation testimony, you did not know whether your co-workers worked off the clock prior to August 2014, is that correct?

MR. COHEN:  Objection.  Judge, it misstates the testimony --

THE COURT:  The objection is sustained.  That

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

testimony was clear, which is that at this point, there were at least two employees who told him that they worked off the clock, and once more that he had seen some work at the christening of the new building --

MR. KAUFMAN:  Okay.

THE COURT:  -- in 2013.

MR. KAUFMAN:  Okay.

Q.  So when you stated:  I understood this question only to seek the information I knew about off-the-clock work done in Whippany, New Jersey before August 2014 because all of the other questions I was asked during that part of the hearing were focused on that time period.

What happened in August of 2014 that is the sort of demarcation?

A.  During 2014, there was a lot going on, but I just focused on what I needed to do, as far as me doing my work that was probably by my managers.

Q.  Okay.

Earlier in your declaration, you state that it was Executive Chief Bertal who arrived in August 2014.  Is that correct?

A.  Yes.

Q.  And that you believed you were only asked questions about the time period prior to Chief Bertal arriving in August of 2014, is that correct?

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

A.  Say the dates again.

Q.  In your declaration in opposition to the motion for sanctions, you state that it was Executive Chef Joe Bertal who arrived in August of 2014, and that you believed you were only being asked questions about the time period up until Chef Bertal arrived in August 2014.  Is that correct?

A.  I believe that is correct.

Q.  So the workers' compensation testimony only concerned the time period, that is what you state your understanding was, of the workers' compensation testimony, that it only concerned the period prior to August 2014 when Chef Joe Bertal arrived.  Is that correct?

A.  Yes.

MR. KAUFMAN:  What Exhibit has pages from 33 on to 41?

MR. COHEN:  Exhibit 3.

Q.  So Exhibit 3, let's start with Page 41.

On Page 41, Mr. Clarke, you were asked the question:  Did your employer require other employees to work similar overtime without pay or was it just you?

That is when you answered:  I don't know if they did.

Correct?

A.  Yes.

Q.  And you are claiming that up until this point, you were

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

only asked questions about the time period before Chef Bertal arrived in August of 2014, is that correct?

A.   Approximately that time frame, yes.

Q.   Turn back to Page 33 of the transcript, please.

If you look at Line 14 of Page 33, the question is: Okay.  So tell me what happened once Bertal got there.  Tell us about what happened once Joe -- Joseph Bertal started working there.

Now, that question is a question about what happened after Mr. Bertal started working at the Whippany location.  Is that correct?

A.   Yes.

Q.   Now, turn to the next page, Page 34, Line 8.

The question is:  So tell us about how things developed.

Do you see that question?

A.   Yes.

Q.   Okay.  So considering that your attorney had asked you about how things started or how things were going once Bertal and after Bertal started, and then how things developed from there, this question would also concern the time period after Chef Bertal arrived at Whippany.

That would be correct?

MR. COHEN:   Objection.

THE COURT:   Overruled.

A.  Yes.

Q.  Okay.  Turn to Page 36, Line 7.  Okay.

So at a certain point, Mr. Bertal stopped you from rotating, and were you given reason why?

Answer:  He said that he would give me back and I could go to those different stations, but right now he just needs me to be at the salad bar, and that is it.

Question on Line 13:  Okay.  And tell me more about then what started happening at that point with respect to the work hours.

So this question is about the time period after Mr. Bertal was at the Whippany location.  That would be correct?

MR. COHEN:  Objection.  That's a misrepresentation of the testimony.

THE COURT:  I'm sorry?

MR. COHEN:  That's a misrepresentation of the testimony.

THE COURT:  Well, let's ask him what his understanding was of what the question was.

Q.  Did you understand this question to concern the time period that Joseph Bertal was working at the Whippany location?

A.  Yes.

Q.  Okay.  So now back to Page 41, when the Judge asked you on line --

THE COURT:  What judge?

MR. KAUFMAN:  The workers' compensation judge.

Q.  -- when he asked you, did your employer require other employees to work similar overtime without pay, or was it just you, you had already been asked questions about your work hours once Mr. Bertal had started at the Whippany location.  Is that correct?

A.  Yes.

Q.  Okay.  Does the Judge ask you a limited time what your answer -- when the Court says:  Did your employer require other employees to work similar overtime without pay or was it just you, is there any time limitation in that question?

A.  A timetable to that question, no.

Q.  There is not.

Let's turn to Page 42.  So you say, I'm sorry, on Line 2.  I am sorry.  I recall something.

Your attorney, Mr. Stern:  Okay.

Mr. Clarke:  Yeah.  I do recall some of us, some of my associates complained to me that they was being forced to work off the clock free.

The Court:  Okay.

By Mr. Stern, your attorney:  Okay.  How long have you -- so now I am looking for a calendar year time frame, how long did this go on for, this working off the clock?

Two or three or four hours a week.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

Answer, Mr. Clarke:  Approximately three years.

Question:  It started in 2013 or 2014?

Answer:  2013.

So in this question you gave a time period of 2013 to 2016.  Is that correct?

A.  Yes.

Q.  And you did not tell your attorney or the workers' compensation judge that any of this started only after Mr. Bertal got there in August of 2014?

A.  That I didn't -- I didn't -- that -- he said I didn't --

Q.  Well, you are claiming you understood these questions to only involve the time period up to August 2014.

And you answered that the time period was 2013 though 2016.

I am asking you in response to this question, did you limit the time period to just after Chef Bertal started at the Whippany location in August of 2013?

A.  Did I limit the time frame to after -- I'm sorry.  I don't really understand the question.

Q.  Okay.  Okay.

At the christening, going back to 2013, you stated that you observed at least two other employees working off the clock.  Is that correct?

A.  Yes.

Q.  Miguel and Stephen Taylor?

A.   Yes.

Q.   And you stated that you knew they were working off of the clock because you arrived, and they were already working.  Is that correct?

A.   Yes.

Q.   And that they complained to you that they had been working off the clock?

A.   Yes.

Q.   Is there any other way in which you know that they were working off the clock, any other observations you made?

A.   When I -- when we was there, they was working before, you know, it was time to clock in, so that is how I know that they was working off the clock.

Q.   Now, isn't it true so far that at the Whippany location, an employee can ask a manager to clock in early, is that true?

A.   That is true, but the managers, a lot of -- most of the time they didn't do that, because they said they had to watch the budget.

Q.   But it could happen?

A.   Yes, it's possible.

Q.   And I take it from your testimony, that you did not observe Miguel or Stephen Taylor clock in and know exactly when they clocked in?

        Your testimony was that they complained to you and

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

they were already working when you arrived?

A.   Well, I believe I said more than that, if I am not mistaken.

Q.   Then my understanding of your testimony, Mr. Clarke, unless I am misreading it, is that you said that you were there working off the clock because they complained to you and because they were already working when you arrived.

MR. COHEN:   Objection, Judge.

THE COURT:   Overruled.

Q.   Is that what your testimony was?

MR. COHEN:   I wrote down what he said, and it wasn't that.

THE COURT:   I'm sorry?

MR. COHEN:   I wrote down what he testified to, and it wasn't that, so that is the basis for my objection.

THE COURT:   The witness can certainly correct him, if it wasn't.

A.   I believe they also told me that they didn't clock in.

Q.   Okay.  So they told you is what I am getting at.

A.   That they had to work off the clock for free.

Q.   So they told you?

A.   Yes.

Q.   So your knowledge comes from what they told you, and the fact that you observed that they were already working when you arrived?

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

A.  Yes.

Q.  Okay.  You did not, and I take it from your testimony, you did not observe when they clocked in and when they clocked out?

A.  No.  I didn't observe that part.

Q.  I take it that you did not observe a manager harassing them to clock in and keep working or to not clock in.  There was no harassing that you observed?

A.  I didn't see that.

Q.  Did you ever receive harassment from managers?

MR. COHEN:  Objection to the form of the question.

THE COURT:  Objection sustained, and it's not particularly relevant to our inquiry here.

MR. KAUFMAN:  I think that is it, your Honor.

THE COURT:  Your witness.

MR. COHEN:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. COHEN:

Q.  Mr. Clarke, in the Whippany -- can you describe what the Whippany location looks like, the area where you worked?

A.  Inside the kitchen is a pretty large kitchen.  It has several exits, entries leading towards the cafe area and the lobby.

Q.  At that location, what was the earliest scheduled start time for any employee you worked with?

A.   The earliest scheduled time?

Q.   Yes.

A.   I believe it was -- I believe it was seven, seven a.m.

Q.   Did you ever see your co-workers there in the kitchen working with you before seven a.m.?

A.   Yes.

Q.   How regularly did you see that?

THE COURT:  I don't want to go there.

This all concerns time frames.  All right?

MR. COHEN:  Okay.

THE COURT:  And your question doesn't have any time frame.  Mr. Clarke's certification, which ultimately led to my granting certification, is extremely detailed about, if I recall correctly, 2016 and some photographs he took, so on and so forth.

But our concern here is about statements which he made about personally observing activity during the period between -- let me see, when did he say that this had occurred?  And we are really talking about two or three certifications here.  Let's see.

The first certification is concerning the period between July of 2013 to September of 2016 in which, among other things, he says that -- let's see.

During the three years I worked for Compass/Flik, I witnessed dozens of class members clock out for the day and

then perform unpaid off-the-clock work including food preparation work, kitchen work, breaking down and cleaning the work stations, cleaning the kitchen area and starting various items to get ready for the next shift.

Okay?

Now, that is the time frame that he asserts that he had personal observations, okay?

The question before me is whether or not I have misrepresentations with regard to that as well as the supplemental certification, which is stated in Paragraph 2 from July 2013 to September of 2016, I worked full time as a full-time cook at Compass/Flik in Whippany, New Jersey and Morristown.  During this time period -- during this time I personally saw dozens of class members arrive at work before their scheduled shift time to complete off-the-clock work, et cetera, et cetera, et cetera.

Now, the focus of this was and is are these representations either incorrect or at least misleading to this Court.

And in the same second certification, he does me about photographs that he took, if I recall correctly.  But those photographs occurred in 2016, right?

MR. COHEN:  Yes, your Honor.  That is what the declaration says.

THE COURT:  Okay.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

Yes.  We have lots of 2016 photographs, so my concern is the statements that he personally observed people from 2013 through 2016 working off the clock, and whether or not his testimony before the workers' compensation judge, indeed, his testimony in front of me would indicate that he did not make such personal observations during that period of time, or at least giving him the benefit of all doubt, that he may or may not have personally observed or believed he personally observed people working off the clock in 2013 at the inaugural celebration of, what was it, was it Whippany or was it --

MR. COHEN:  Whippany.

THE COURT:  -- Whippany.

All right.  And then as I understand it through his testimony, he doesn't have any personal observations until at best much, much later.

Now, that is what I got before me.  You may have had people complain at some points in time, but what he told me was I personally observed during that period of time.

If you want to focus on that, let's focus.  But I will tell you, I have already given you folks an hour and a half for this.  You have ten minutes to clean it up.

MR. COHEN:  Okay.

Q.  Mr. Clarke, have you described today all of your actions that you can remember where Flik associates complained to

you about working off the clock at Whippany?

A.   Hum.

Q.   Take a minute and think about it, and let us know.

A.   Have I described everything?

Q.   All of the instances of somebody complaining to you about performing off-the-clock work at Whippany?

A.   No.

Q.   Can you tell us in 2000 -- well, do you remember by year or do you remember by individual?

What would be the easier way for you to explain who you remember complaining to you about off-the-clock work?

A.   I observed people working off the clock in 2013.

Q.   I am asking you about people complaining to you.  I'm not asking you about what you saw.  Right now I am asking you about what you heard.

Can you remember talking to any Flik employees who were complaining to you or telling you about them working off the clock at the Whippany location?

MR. KAUFMAN:  Objection, asked and answered several times.

THE COURT:  I will let him ask it again.

Q.   Sir, tell us who.  Who complained?

A.   Stephen Teller, he complained.

Q.   When?  Do you remember?

A.   In 2013,

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

Q. Any other times?

A. I believe so. There were other times, but I didn't pay it any mind.

Q. Who else complained to you about working off the clock at Whippany?

A. It doesn't matter what time frame?

Q. Let's do it by person, and then we will talk about the time.

Who else do you remember talking to people about working off the clock?

A. Miguel.

Q. Miguel who?

A. I don't know his last name.

Q. Do you remember when he complained to you about off-the-clock work?

A. That was also of 2013.

Q. Do you remember anyone else who complained to you about off-the-clock work at Whippany?

THE COURT: Well, that has been already asked and answered, and he said only Miguel, so we're not going to do it again.

MR. COHEN: He's just going person by person, your Honor, so I'm just asking the next question.

Q. Is there anybody else?

A. There were so many people, and it was a long time ago,

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

so I can't remember different names.

Q.  Okay.  About how many people do you remember complaining to you about performing off of the clock work at Whippany?

A.  In general, many, many people.

Q.  More than ten?

A.  Yes.  Definitely more than ten.

Q.  More than 20?

A.  Over the years, definitely over 20 people.

Q.  During over what period of time did these people complain to you?

A.  From 2013 and I believe I recall -- I believe I remember in 2014, '15, '16.

Q.  Now, in terms of you personally observing off-the-clock work from people, if somebody is simply in the kitchen working, and it's, you know, early in the morning, would you just by looking at them know if they had clocked in or clocked out already?

A.  Yeah.  I would know, because I would see that the time, everybody's schedule is right there by the time clock, and I would see working, and it was not their time to clock in.

Q.  Okay.  During what years did you see people, Flik associates at the Whippany location working in the kitchen before their scheduled start time?

A.  I seen it in 2013.  As far as -- and I didn't really pay that much mind, and I believe I may have seen it 2014, but I

really started noticing it, I really started taking notice about it in 2015 when I started really seeing a lot of people working off the clock and a lot of people was complaining to me about it, and then I started complaining about it. I started asking -- complaining to managers about it.

Q. Does your awareness -- so I mean before this lawsuit, before all of this litigation started, you were a cook, right?

A. Yes.

Q. Did you have any experience with wage and hour law before the case started?

A. No.

Q. So has your understanding of wage and hour issues and what it means to be working off the clock grown over the years since the case has started?

THE COURT: Objection sustained as leading. Come on.

Q. Do you know more today about off-the-clock work?

MR. KAUFMAN: Objection.

THE COURT: Sustained.

Finish it up.

MR. COHEN: Thank you, Judge.

Q. How many people do you remember seeing working off the clock during the years you described? How many different

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

people?

A.   So many people came and went.  It was a lot of people that was working off the clock.

Q.   Dozens?

A.   Yes.

Q.   Do you remember their names?

A.   Not everybody, but I know Stephen Teller is definitely one of them.  Juan Dique, I remember him.

Like I said, after 2015, that's when I really started taking notice and I -- Martha Able, hum, Wendy, hum, Wendy -- who else -- Sarah, Juan, Julio, and so many others.

Q.   Beginning in 2016, you started documenting instances of what you believed to be off-the-clock work at Whippany, right?

A.   Yes.

MR. KAUFMAN:  Objection, leading the witness.

THE COURT:  It may be leading, but it is perfectly obvious since we have already referred to this.

Q.   Why did you do that?

A.   Because I complained to human resources.  I complained to union managers that I was seeing this going on, and they told me that they was going to take care of it.

One of the general managers, his name is Rocco Cappone, this was in 2015, he told me that, you know, he knew that it was happening for some time.

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

THE COURT:  Okay.  This is totally irrelevant to the issues in front of me.

MR. COHEN:  That was my last question.

THE COURT:  Good.

Anything further?

MR. KAUFMAN:  No, your Honor.

THE COURT:  Mr. Clarke, step down.

(Witness excused)

THE COURT:  All right.  You have five minutes to argue in front of me.  Let's go.  It is your motion.

MR. KAUFMAN:  Your Honor, there has been a lot of troubling -- frankly a lot of shocking statements made in the initial certification motion, in his opposition to the sanctions motion and here today.

Mr. Clarke claimed to have personal knowledge throughout his entire work life, that is very specifically pointed out.  As you have noted in his declaration, from 2013 to 2016, he claims he personally observed.  He personally witnessed managers harassing employees to work off the clock.  He witnessed employees working off the clock before their shift, during lunch and after their shift, but it turns out that is not what he personally observed.

On a few occasions he can only name a few employees, although he says it's dozens, employees complained to him about arriving early.  Nothing about

after, nothing about during lunch, which puts, you know, completely at odds what he has put in his declaration.  Not to mention the fact, that if you get to his workers' compensation testimony, and he clearly and unambiguously states in response to a direct question that it is not limited in time in any way.

Do you know whether your company required your co-workers to work off the clock?

He said:  I don't know.

Unambiguous direct question, and he says I don't know.

His opposition just causes more problems.  He gives an excuse in a sworn declaration that says he thought it was only for the time period from 2013 to August 2014.  Any reasonable reading of the transcript as you went through it shows that to be false.  It is simply another false statement in a signed declaration that he has submitted.

It also puts him directly at odds with the previous declarations that he submitted, even taking what he is saying as true.  We listened to the testimony.  For now he is really saying that it was only 2015, 2016, that he claims he observed off-the-clock work.

The bottom line is Mr. Clarke has made numerous false and at best misleading statements to the Court that requires sanctions against him and that requires a new

certification of this conditionally certified collective action, and we believe that the opposition submitted in response to our sanctions motion is extremely problematic for both Mr. Clarke and Mr. Cohen and what they represented in that opposition motion and signed their names to.

Thank you, your Honor.

THE COURT:  Thank you.

Mr. Cohen?

MR. COHEN:  Thank you, Judge.

I have read your opinions on sanctions.  I know that you are hesitant to grant sanctions.  I know that you are aware of the exceptional circumstances required to justify sanctions under New Jersey law and federal law.

I don't -- I read the one case, particularly the Pow versus Jersey City Medical Center case, where the plaintiff was accused of making misrepresentations to the Court and opposing counsel about her sickness and about availability to get benefits and scheduling, and in that case even your Honor read the allegations were similar to here, that the plaintiff was lying about things or misrepresenting things.  Your Honor saw fit not to order sanctions.

Here, your Honor, my understanding from all of the arguments that I heard from counsel and also your guidance, Judge, the main concern is, was conditional certification

entered in error as a result of false statements.

What I read in Mr. Clarke's declarations is supported by his testimony today from 2013 and 2016, he in fact saw dozens of people working off the clock.  He in fact heard complaints from people working off the clock.  He has not made those statements to mislead the Court.  He has made the statements to describe the experience he had during his employment.

It is possible, Judge, that these statements could have better said during my employment, with the exception of calendar year 2014, I observed these things.

That's absolutely true, Judge, and if in an ideal world where perfection was the goal, that would have been better.

Working with clients to get statements for legal cases, perfection is often not achieved.  I don't see in these declarations, Judge, we have gone through the paragraphs repeatedly today, during the years I worked for Flik, I personally observed dozens of class members work off the clock.  That is certainly what he has testified from July 2013 to September 2016, he personally saw.  Of course, that is his testimony again today.

To the extent that the Court feels that misrepresentations have been made here, to the extent that the Court -- that our actions have given rise to confusion,

a misunderstanding, certainly Mr. Clarke denied also -- I apologize, Judge, that was not our intention.  Our intention was only to describe a great many events Mr. Clarke experienced dozens and dozens of times over years of employment.

And also, your Honor, I will make this one point. I couldn't understand how to do this through testimony, but what we are talking about here, the specific detail of observing someone working off the clock is something Mr. Clarke explained he could see by virtue of comparing a person's scheduled time to his watch or a clock, at the time he saw them working.

But, your Honor, it is entirely also possible that this gap in time in 2014, where Mr. Clarke is saying he had his nose down, he was paying attention to his own business. He's not telling you that he saw people working off the clock because he wasn't consciously looking for it.  But if he saw it without thinking about it, it doesn't undermine his claims.  It gives them support.

THE COURT:  Mr. Cohen, to say that this situation disturbs me is the ultimate in understatements.  Now, none of us in this room are totally naive.  Mr. Clarke's certifications were drafted by counsel based upon discussions with him and ultimately reviewed by him.

Mr. Cohen, did you draft those certifications?

MR. COHEN:  Yes, your Honor, as I described after discussions with Mr. Clarke and with his approval.

THE COURT:  All right.

Now, Mr. Cohen, you are absolutely right.  I am extremely reluctant to impose sanctions in a case, okay, and this case and what's developed here is not something which you should be proud of.  Mr. Clarke since he submitted that certification was the individual who was the subject of a Rule 11 sanctions motion, correct?

MR. COHEN:  Yes.

MR. KAUFMAN:  Yes.

THE COURT:  Now, ultimately, you interviewed him and based upon what he told you, you submitted these certifications to the Court and considered them appropriate summaries of the information, which he may have provided to you.  This case should be an abject lesson.  You know what kind of submissions are given to a Court.

Based upon Mr. Clarke's testimony, the assertion that from July 2013 to September of 2016, I worked full time as a full-time cook at Compass/Flik Corp. Centers in Whippany, New Jersey, in Morristown, New Jersey.

And then Paragraph 3:  During this time I personally saw dozens of class members arrive at work before their scheduled shift times complete off-the-clock work like, et cetera, et cetera, et cetera.

Mr. Cohen, that is a misleading statement and, Mr. Cohen, you are responsible for it.  If you want to submit something to the Court, you could have elicited exactly the kind of information that Mr. Clarke already gave us on the stand, what he saw, observed and was asked at the 2013 opening of the gourmet center, what people said to him, and that is all you have to do.

You don't have to give names, but you could have used initials or whatever.  You could have told me that during the period or during the substantive period, other people complained.  You could have told me that, indeed, given the nature of the operations there, when you see somebody working before their clock-in time, while it is possible that they may have gotten approval to work and clock in before their ordinary time, that in his experience that was rarely granted, and that given the nature and the volume of what he saw, that he reached a conclusion that he gave these people work, working off the clock when they arrived early, and that was combined with the fact that people complained to him, and you could have given me names.  Instead, you gave me a misleading conclusion.

Now, opposing counsel is asking me did you certify this class as a sanction.  There are fundamental problems with doing that.  One, as you have indicated, we have class members who already signed affidavits, correct?

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

MR. COHEN:  Yes, Judge, six.

THE COURT:  Okay.

And those individuals are functionally plaintiffs in this case.  It's as simple as that.  This Court is not about to penalize individuals who are already plaintiffs in this case through decertifying them.

The Court is not about to impose a sanction on Mr. Clarke because truthfully Mr. Clarke simply ended up essentially, I would assume in good faith, signing what he believed was your accurate summarization of the information which he provided.

I am also satisfied that given the information in the supplemental certification, in which Mr. Clarke went out to, in fact, try to document instances of people clocking in, or working without being clocked in, that that provides, indeed, an independent factual basis to support certification in this case.

In the end, as we all know, there is a certification process that is simply a process by which the Court authorizes a plaintiff and his or her attorney to give notice to a group of employees that they can become plaintiffs in a collective action, if they wish to, and this Court already has concluded that at best, that was warranted in regard to one particular location, so the Court is satisfied that there has been no substantive injustice which

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

has occurred here.

But, Mr. Cohen, I think you should recognize two things.  First of all, Mr. Clarke's credibility, as this case goes along, is now going to be subject to substantial questioning given the testimony which I have heard here.

Secondly, you should have learned a lesson, which is if you are going to continue in this area of practice, even gentler judges like me do not appreciate having material submitted, which glosses over facts and which does not represent the truth, the whole truth and nothing but the truth.

I am satisfied that at this point my admonition to you will be taken to heart and satisfied that as to Mr. Clarke, who while he signed and blessed as wholly accurate, that nevertheless under the circumstances, that is not something that should warrant sanctions being imposed upon him, and I am going to deny the sanctions motion.  I will caution you, as I said, do not let this kind of thing happen again.

For the reasons set forth on record, the motion for sanctions under Rule 11 is denied.

Let me see counsel in chambers.

(Court adjourned)

PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Phyllis T. Lewis, CCR, CRCR

- - - - - - - - - - - - - - - - - - - - - -

Court Reporter/Transcriber

October 4, 2019